STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. JAMES MAGEE, DEFENDANT-APPELLANT.

Argued April 23, 1968—Decided July 11, 1968.

---

354

---

*Mr. Raymond A. Brown* argued the cause for appellant (*Mr. Irving I. Vogelman* on the brief).

*Mr. William L. Kattak,* Assistant Prosecutor, argued the cause for respondent (*Mr. John G. Thevos,* Passaic County Prosecutor, attorney).

The opinion of the court was delivered by

FRANCIS, J.   Defendant James Magee was convicted of murder in the first degree and was sentenced to life imprisonment upon the jury's recommendation. *N. J. S.* 2A :113–4. The State did not seek the death penalty. He appealed directly to us under *R. R.* 1 :2–1(*c*) prior to its amendment

on October 5, 1967. The only question presented is whether oral and written incriminatory statements made by defendant while in police custody were properly admitted in evidence.

Shortly after 7:00 A.M. on Saturday, January 15, 1966, the body of a 16-year old girl, Camilla Johnson, was found on the ground near a fence a short distance from the rear of Public School No. 15 in Paterson, N. J. She had been strangled. Autopsy showed a laceration of her left breast, as if it had been bitten, and laboratory tests established recent sexual relations.

During the course of the day, through questioning friends of the decedent, the police learned that Magee was acquainted with her and had been looking for her in the early morning hours of January 15.

Before 5:00 P.M. on January 15 the Paterson police had assembled the following evidence, which was testified to at Magee's trial: At about 3:00 A.M. that morning three men, Edward Lenney, Robert Dries and Joseph Bobacher parked Lenney's car in Paterson Street in Paterson across from a diner. After they had gotten out of the car Lenney saw a girl alight from an Oldsmobile (later established to be Magee's) and walk toward them. She was Camilla Johnson, although none of them knew her. A conversation ensued following which she got into the car with the three men and they drove off. They went to Saddle Brook and parked at the terminal of the trucking company where the three men were employed. There each one in turn had sexual relations with her. Afterwards Lenney and Dries and Camilla Johnson returned to Paterson. They dropped her at about 5:30 A.M. at the corner of Paterson and Van Houten Streets.

Willy Lee Debnan, an acquaintance of both Camilla Johnson and Magee, met Magee around 3:00 A.M. at the diner in Paterson. Magee told Debnan that he had seen Camilla enter a car with three men, and that he was supposed to see her later. Debnan left the diner and returned around 5:00 A.M. Magee was still there and apparently concerned that Camilla had not returned. A few minutes later Magee, Debnan and

another friend, Harry Oldham, drove to a wooded area in Totowa Borough where they thought the three men might have taken her. Their search being unsuccessful they came back to the diner in Paterson around 5:35 A.M. and Magee dropped the two men off. Where he went after that they did not know. Oldham and Debnan continued their search for Camilla in the area and about 6:45 A.M. went into Sharpe's Restaurant which was in the neighborhood. There they met Carol Gibbons, another friend of Camilla's. She was also a friend of Magee's and saw him frequently. "On towards" 7:00 A.M. Magee came into the restaurant. All four of them began to discuss Camilla's absence, and in a few minutes left in Magee's car to search for her. They returned to Sharpe's at about a quarter of eight. A conversation ensued about Magee and Carol Gibbons driving to New York. Magee made a telephone call following which he and Mrs. Gibbons left for New York.

Although the police had not interviewed Mrs. Gibbons before 5:00 P.M. on January 15, they did bring her to headquarters around 9:00 P.M. that evening. She told the police, and so testified later, that she saw Magee around 4:30 A.M. on January 15 sitting in his car across the street from Sharpe's. He said he was waiting for Camilla Johnson. Mrs. Gibbons then went to Passaic with some friends, returned to Sharpe's about 6:35 A.M., ordered coffee and was drinking it when Magee walked in. She confirmed the facts Oldham and Debnan had furnished about the renewed search for Camilla in Magee's car and the subsequent return to Sharpe's. After some further discussion as to what might have happened to her, Magee suggested that Mrs. Gibbons call the hospital to "find out if she was hurt or anything." Mrs. Gibbons telephoned one hospital and was told that the information office was not yet open. The matter was then dropped. She and Magee drove to an apartment house in New York where she remained about a half-hour. He left her for about fifteen minutes of that period. They returned to Paterson around 11:00 A.M. He dropped her at a friend's house there.

Around 5:00 P.M. on January 15, Lieutenant Peter Venti-
miglia of the Paterson Police Department telephoned Magee
at his home in Teaneck, N. J. and asked him to come to
headquarters for questioning in connection with the murder
of Camilla Johnson. Magee was aware of the death. Oldham
had telephoned the news at 11:30 A.M., saying she had been
found dead near a school yard. Carol Gibbons had called him
also, apparently shortly before Lieutenant Ventimiglia, ad-
vising him that Camilla was dead. Magee arrived at head-
quarters about 5:30 P.M. to 5:45 P.M. where he met Lieuten-
ant Ventimiglia who took some preliminary biographical data,
and inquired if he knew Camilla Johnson. He was then
taken to a large room where he said he saw his friends Willy
Lee Debnan, Harry Oldham and Carol Gibbons. (It seems
unlikely that he saw Mrs. Gibbons at that time. The testi-
mony is that she was not brought in by the police until some
hours later.) From there he went to a smaller room where
he was first questioned. According to the State, Captain
Gourley and Detectives Mahull, Pinello and Campbell were
present. Magee inquired as to why he had been summoned
and what the charge was against him. Gourley testified that
he told Magee they were investigating a homicide; they had
information that he had known the deceased Camilla John-
son, and they wanted to speak to him about her death. Gour-
ley then told the defendant,

"* * * that he didn't have to say anything if he didn't want to,
that he was entitled to a lawyer to be present. If he didn't want
a lawyer, or if he couldn't afford a lawyer that the Court would
appoint one for him and anything he did say could be used sub-
sequently at this trial if the case came to court."

Mahull and Pinello confirmed Gourley's statement that these
warnings were given. Campbell did not testify. He had
resigned from the police department prior to the trial. On
direct examination Magee denied that Gourley was present
at the time and denied also that he received the warnings
or advice as to his rights. He insisted he first saw Gourley

the next morning, Sunday, January 16. But on cross-examination he testified:

> "Q. Did you see Captain Gourley that evening?
> A. Yes.
> Q. What is your answer?
> A. I don't remember seeing him.
> Q. What?
> A. I don't remember seeing him."

Moreover, in an affidavit filed by Magee in connection with a pretrial matter, he said "a police captain" was present in the room when this first interrogation took place. Gourley said further that he did not see or speak to Magee at all on Sunday, the 16th. In this he was corroborated by Mahull and Pinello, who asserted that there was no questioning of Magee at any time on that Sunday.

According to the officers, when Magee was advised of his rights in connection with the proposed questioning, he said "I don't need a lawyer. I didn't do anything." Magee was not a stranger to courts and lawyers. He had been convicted of robbery in New York State in 1948 and sentenced to five years in prison. In 1963 he had retained an attorney to represent him in connection with the purchase of a home in Teaneck, N. J. That transaction was completed in 1964. The same attorney represented him in several other matters. One was the defense of a civil suit against Magee. Several others involved the prosecution of workmen's compensation claims arising out of work-connected injuries suffered by him. One of these actions was completed while he was in jail and before the trial of the present indictment. One such case was still pending at the time of this trial. When an attorney was called by Magee's wife, he was this personal attorney whose office was only a few blocks away from police headquarters.

Gourley said he participated in the interrogation of Magee for about an hour beginning around 7:00 P.M. on January 15. Then he departed leaving Magee with the other

officers. The questioning continued at short intervals there-
after, apparently in the captain's office and other rooms.
Magee denied he had anything to do with Camilla Johnson's
death. The investigation was simultaneously proceeding in
other directions during this evening and night. The de-
tectives were interviewing Lenny, Bobacher, Dries, Debnan,
Oldham and Carol Gibbons. As the result of the interviews,
however, in the early morning hours of January 16, Debnan,
Oldham and Carol Gibbons were arrested as narcotics users,
and around 3:30 A.M., on the basis of information obtained
from those persons, Detective Mahull arrested Magee as a
seller of narcotics. The department record shows that all
four of them were booked on those charges at about 4:00
A.M. When the booking was finished, Magee and the others
were placed in cells and Mahull went home, ending the in-
vestigation for the night.

As had been indicated, the officers said Magee was not
questioned at all during the day on Sunday, January 16.
Captain Gourley and Mahull returned to headquarters at 1:00
P.M. that day. The investigation of the death continued then,
consisting among other things of some further interviews
with Carol Gibbons, Debnan, Oldham, Lenney, Bobacher and
Dries. On Monday, January 17, Gibbons, Debnan and Old-
ham were arraigned on the narcotics charge. For some rea-
son, Magee's arraignment was postponed until the next morn-
ing. Thereafter, according to Mahull, from 10:30 A.M. to
6:00 P.M., he was engaged in taking formal statements from
Carol Gibbons and Debnan, and in questioning Oldham.
Around 6:00 P.M. Mahull went to a small interrogation room
where Magee was at the time, bringing with him sandwiches
and coffee. After giving him the food, Mahull remained, at
his request, and the two talked for an hour and a half. Ac-
cording to the State this was the only police contact with him
on January 17. The conversation was friendly, said Mahull,
there was some discussion of bowling, and at Magee's request
he went downstairs to get cigarettes for him. Mahull said,
however, he thought Magee had killed the girl, told Magee

he thought so, and asked him to admit it. Defendant refused, saying he did not kill her, and "You wouldn't want me to tell a lie." Around 7:30 Mahull left, made up some reports and went home. Magee was returned to his cell shortly afterward.

The next morning, Tuesday, January 18, Mahull came to headquarters about 9:00 A.M. for Magee's arraignment on the narcotics-sale charge. He went to the cell block and spoke to defendant, telling him he would be going before the magistrate very shortly. At this Magee asked if Mahull was not going to talk to him "some more." Mahull answered there was no point in further talk since he had denied involvement in the murder, whereupon defendant said "Suppose I want to tell you that I did kill Camilla Johnson and wanted to tell you about it." Mahull replied he could prove it by telling what he had done with Camilla's coat and purse. Magee then said he had thrown them in the garbage and they were probably burned by that time.

Mahull informed Captain Gourley of Magee's apparent willingness to confess. Defendant was then brought to Gourley's office where, in the presence of Gourley, Lieutenants Ventimiglia and Rafferty, and Detectives O'Neil and Mahull, he made a short oral confession. Its substance was that in the early morning of January 15 he had picked up Camilla as she was walking down Market Street from Paterson Street. He drove to a school area, parked and tried to have sexual relations with her. She resisted and tried to strike him; a struggle ensued and he grabbed her by the throat with both hands and choked her. He then drove to the rear of the school, dropped the body off and went back to Sharpe's Restaurant.

After this admission defendant agreed to take the officers to the place where the incident occurred. The five officers and Magee then left headquarters in two police cars. Gourley, Mahull, O'Neil and Magee were in one car. Magee directed their course to the point where he had picked up Camilla Johnson, from there past the place where he had

parked with her and where the struggle took place, and on to the end of the parking lot in back of the school. They stopped there, got out of the car and Magee walked directly to the spot where the body had been found. Photographs were taken showing these various locations. Thereafter defendant took the officers back along the route he followed in returning to Sharpe's Restaurant after the killing. On the way back he had them stop where he said he had parked while he took Camilla's coat and purse, which were on the front seat of his car, and put them in the trunk. They continued on toward Sharpe's where Magee told them he went a few minutes later and where he met Carol Gibbons, Debnan and Oldham.

On returning to police headquarters at approximately 11:45 A.M., Gourley, O'Neil, Mahull and the defendant had coffee. At 12:45, at the request of Mahull, Magee gave him a detailed account of the happenings of the early morning of January 15. Mahull then asked if he would give the statement in typewritten form, and Magee agreed, but said he would like to telephone his wife and lawyer first. Mahull took him to a telephone immediately where he called his wife, following which he said his wife was going to arrange for counsel and bring him to headquarters. On being asked if he wished to wait for his wife and lawyer, he replied in the negative and said they could go ahead and "when they come, they can come in." The statement-taking proceeded at 2:16 P.M. in the presence of Detectives Mahull and O'Neil, after Magee was told again that he did not have to answer any questions if he did not wish. Question and answer form was used, Mahull typing out each question, reading it to Magee and typing each answer as it was given. The statement was completed at 4:35 P.M., at which time Magee said he did not wish to add anything, and that it was true "as much as [he] can remember." Magee then read it out loud but refused to sign it saying he wanted his lawyer to read it first. He did initial the top and bottom of the first four pages, but not page five, the last one. That page contained

a typewritten line for his signature. Although refusing to sign there, he did swear to the contents of the statement as the truth before a police officer-notary public who affixed his jurat. O'Neil and Mahull also signed as witnesses.

In the statement, after detailing how he waited and searched for Camilla, he said he finally found her walking on Market Street and picked her up. He drove to the school and parked nearby. There, after talking about what had happened with the three men and about sex, he tried to have relations with her. He pulled up her bra and started to play with her left breast. (We refer to this particularly because, as above set forth, the autopsy found the breast to be lacerated, as if bitten.) He tried to force himself on her but she resisted, pushing him away and striking at him. He "grabbed her by the neck * * * to get her under control" and "just held on until she went limp and that was it." He then drove a short distance to the place he had shown the police earlier, took her out of the car, laid her on the ground and left the scene. He did not "wait to find out" if she was dead. On the way back to Sharpe's Restaurant he stopped and put Camilla's coat and pocket book in the trunk of the car. At Sharpe's he found Carol Gibbons, Oldham and Debnan, who were concerned about Camilla, and after some conversation all four went out in Magee's car looking for her. He and Carol Gibbons returned to Sharpe's, had something to eat and left for New York. While Carol was in an apartment on 128th Street in that city, he removed Camilla's coat and pocket book from the trunk of his car and put them in a garbage can.

Shortly after the statement had been taken Mrs. Magee arrived. She was not accompanied by the attorney. Mahull said he told her what had happened and she was allowed to visit with her husband for about a half hour. Immediately thereafter she telephoned their attorney Jerome J. Gelman, Esq., apparently for the second time. The testimony indicates that Mrs. Magee had called Gelman shortly after her husband telephoned her and had visited his office just before

coming to police headquarters. Gelman testified that while she was in his office he telephoned the detective bureau, inquired about the Magee case and informed an unidentified person on the other end of the line that he would be over in about an hour. He was unable to get there, however, until between 5 :30 and 6 :00 P.M. At that time he saw and talked with Magee, but he was not shown the unsigned confession. Oddly enough the record is silent as to whether anyone told him a confession had been given. It does appear that Magee did not sign the document after his interview with Gelman. At 5 :43 that afternoon he was formally charged with murder. Arraignment took place the next morning with Gelman representing Magee.

Magee took the witness stand only on the issue of voluntariness of his oral and unsigned confessions. In that connection he said that after arriving at the police station on the evening of January 15 he was interrogated constantly from 7 :00 P.M. until 8 :30 the next morning, when he first saw Captain Gourley who questioned him for an additional hour and a half. During the night the three or four detectives examining him denied him food, drink and sleep and refused him permission to make a telephone call. The officers denied these assertions, except that one officer said he had no recollection of any request to use the telephone. It became obvious in the course of further direct and cross-examination that Magee was not questioned continuously throughout the night, but rather at intervals until about 3 :30 A.M. He conceded that for some period he had been put in a cell and later brought out again. The other persons referred to earlier herein were also being questioned during that evening and night and information obtained from those sources resulted in further interrogation of Magee. We are satisfied from a review of all the evidence on this aspect that as the investigation progressed Magee was questioned at intervals for relatively short periods and in different rooms; that it ceased completely around 3 :30 A.M., that he was booked about 4 :00 A.M. as a narcotics seller, along with Carol Gib-

bons, Oldham and Debnan as narcotics users, and then he was returned to his cell. Mahull went home at this time, and his notes, about which he was examined at the trial, support him in that respect. It is noted also that on cross-examination in connection with the claim that he was denied food or drink Magee was asked:

"Q. Now that evening did you have coffee with the other detectives while they were interrogating you?
A. I remember once or twice having coffee."

Magee made no serious complaint that he was physically abused on January 15 or any other time before the confession was given. He did say that Detective Pinello waved his finger in his face and cursed at him. Another unidentified officer allegedly lifted up defendant's right hand saying that it was the hand that strangled Camilla Johnson and he should admit he did it, then the officer slammed the hand down on the table. Pinello denied cursing or shaking his finger at Magee, and Mahull and others supported him. In addition no officer saw anyone slam Magee's hand down on the table. The trial court found that at no time before or during the confession was Magee in fear or panic. In our judgment that conclusion was clearly justified. Magee testified that he asked permission to make a telephone call not only on Saturday night, but on several other occasions between then and Tuesday, January 18. He could not identify a single officer to whom the request was made, although he said at one time it must have been Mahull because he was with him most of the time. Mahull denied any such requests except the one made after the oral confession had been given and before preparation of the written one on Tuesday, January 18. Other detectives participating in the investigation and questioning made similar denials, except O'Neil who said he did not remember that any such request was made while he was present. The trial court specifically found there was no request to use the telephone until the early

afternoon of January 18. We are in agreement with that conclusion.

Magee's testimony as to the happenings on Sunday, January 16 was ambiguous and indefinite. He said Captain Gourley questioned him at some time between 6:00 and 9:00 A.M.; other detectives, whom he could not identify, although at one point he named Mahull as one of them, also examined him during those hours. After this he remained in his cell until 5:00–6:00 P.M. when he was again questioned for about two hours. The evidence is thoroughly convincing that Mahull and Captain Gourley did not return to duty until 1:00 P.M. that day. Furthermore, we are satisfied, as was the trial court, that Magee was not questioned at all during the day on Sunday; that the investigation, for the part of the day it occupied the police, was confined to other aspects of the case.

Magee's testimony relating to events on Monday, January 17, was just as ambiguous, uncertain and evasive as it was about Sunday's happenings. He asserted he was questioned in the morning and again in the afternoon. He could not fix the time, nor the length of the interrogation, nor the detectives who participated. The credible evidence shows that Monday was spent in taking statements from the other persons, already named, who were in custody. About 7:00 that evening Mahull, who had been occupied with those statements, visited Magee in a room to which he had been brought. As set forth above, Mahull brought coffee and sandwiches along with him. Then the two men talked for about one hour and a half. There is no doubt that Mahull apprised defendant of the statements Carol Gibbons, Oldham and Debnan had supplied, and told him also that he, Mahull, believed Magee had murdered the girl. This meeting, we are convinced, was the only police interview with Magee on Monday.

The events leading up to the volunteered inculpatory admission on Tuesday morning just before Magee's arraignment on the narcotics charge have been recited above, as well as the more formal oral and unsigned confessions, and the

visit to the scene of the crime. Magee denied inviting further questioning and volunteering the inculpatory information. He said that about 9:00 A.M. Mahull brought him up to Captain Gourley's office. Present there were Gourley, Lieutenants Rafferty and Ventimiglia, and Detective O'Neil. He asked Mahull where they were going, to which Mahull replied "for a ride." He recalled no questioning by anyone, and he denied admitting having killed Camilla Johnson. He was taken over the route described above, but denied that he directed the course taken. He got out of the car at Mahull's direction in the school area and at the detective's order walked over near the fence. The place was unfamiliar to him; he had never been there before. He denied pointing out the place he had parked with Camilla or where he had placed her body. He said he had nothing to do with the route taken from the school grounds.

Within a short time after return of the party to headquarters, Mahull and O'Neil obtained the more detailed oral confession and then the typewritten one in question and answer form in the manner already detailed above. Magee conceded he was in the room with the two officers but he denied making the second oral statement or the typewritten one. With respect to the typed confession, as the prosecutor went through it with him question by question and answer by answer, he denied that he was asked the questions and he denied he gave the answers. He said the entire document was made up by Mahull and given to him to sign. He started to read it, but after reading "just the beginning," about half the first page, "a quarter of the page," he said it was not the truth and he would not sign it. He read no part of it "other than just starting that first page"; he did not read "page two, three or four." Examination of the first page of the confession shows that, aside from a reiteration of his right to be silent, it contains nothing but questions and answers about biographical material, and a question as to whether he knew where he was at the time and the reason for being

there. In our view the trial court rightly declared that testimony incredible.

In addition to denying that the questions on the typed confession were put to him and that he gave the noted answers, he denied certain facts appearing in the answers which have clearly acceptable support in the testimony. For example, not only did he deny he was asked certain questions and gave certain answers about leaving Sharpe's Restaurant in the early morning of January 15 with Carol Gibbons, Oldham and Debnan, and driving to a place to look for Camilla, he also denied that the incident took place. The same situation arose with respect to the trip to New York with Carol Gibbons on the morning of January 15 (after the time of the killing). He not only denied he was asked about it and gave the recorded answer, but he denied that he had in fact gone to New York with Mrs. Gibbons. These fact denials were completely at odds with the testimony of his friends Gibbons and Debnan, and put his veracity further in the shadow.

At another point in his direct examination about the typed confession he was asked:

"Q. And did you throughout this interrogation tell him it was not right and you would not sign it?
A. Yes sir."

This is hardly consistent with his testimony that he was never asked a single question and did not give a single answer appearing on the unsigned confession. Farther on, but still in his direct examination, he said that after he telephoned his wife and told her to get a lawyer, Mahull typed up the statement and on completing it, asked him to sign it. In answer he did not say he refused because he did not know what was in it or that it was not true, but simply, "I told him I wouldn't sign it until the lawyer got there."

Magee admitted he placed his initials at the top and bottom of·each of the first four pages of the confession. This

was done, he said, at Mahull's request so the pages could not become misplaced, and so nothing could be added to the top or bottom of a page. He did not initial the fifth and last page because there was a line there for his signature and he told the detectives he wanted "to see his lawyer first," and would not sign until his lawyer arrived.

In accordance with the practice, the testimony relating to the confessions was taken first out of the presence of the jury. At its conclusion the trial court engaged in an elaborate review and evaluation of the proof covering 15 pages of the transcript. Among other things he specifically found "from the totality of the evidence" that the warnings and advice as to Magee's right to an attorney required by *Miranda v. State of Arizona*, 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed. 2d* 694 (1966) had been given to defendant by Captain Gourley before he was interrogated, and that he was fully aware and understood those rights when he freely and voluntarily gave his inculpatory statements. In conclusion the court stated:

"I find that the State has carried the burden of establishing that defendant's confessions, oral and written—by written, I mean typed— were the product of a person who is fully aware of his constitutional rights, and that his will was not overborne and that such confessions were the product of an essentially free and uncontradicted choice made voluntarily by the defendant.

The record is void of any evidence that defendant lacked or lacks mental capacity to appreciate his rights to a lawyer and to remain silent, and of the consequences of a failure to exercise such rights. The defendant was very alert as he sat testifying in open court, and at times very evasive and hesitant in answering the questions of the prosecutor, and that certain times delayed answering understandable questions for a period of one to five minutes, and at times was non-responsive to simple and understandable questions.

I am satisfied from the credible evidence adduced, from all of the credible evidence adduced both by the State and the defense, that the oral confessions and written statements of the defendant were made by defendant with full understanding of their consequences."

Following the court's finding that defendant's incriminatory statements were voluntary and therefore admissible, the

testimony was repeated in the presence of the jury. There-
after the issue of voluntariness was submitted for the inde-
pendent determination of the jury. The verdict of guilt of
murder in the first degree clearly demonstrates the jury's con-
currence with the view of the court.

I

Defendant's attack on the judgment of conviction is based
upon a claim that his oral and typed but unsigned confessions
should not have been admitted in evidence. More specifically,
he asserts (a) that the State did not sustain the burden of
proof necessary to show that the warnings and advice re-
quired by *Miranda v. State of Arizona, supra,* were in fact
given; (b) that the evidence demonstrates a deprivation of
his right to counsel by the police because the typed confession
was taken after he had requested counsel and (c) the State
did not sustain the burden of proof necessary to show a
waiver by defendant of his privilege against self-incrimina-
tion and his right to counsel within the terms of *Miranda
v. State of Arizona.*

(a)

The evidence reveals that as soon as Magee was taken into
custody, and before any interrogation began, the police cap-
tain in charge told him he had been brought in for ques-
tioning in connection with the death of Camilla Johnson, ad-
vised him of his right to be silent, that he was entitled to
the presence of a lawyer, that if he could not afford a lawyer
the court would appoint one for him, and that anything he
said could be used at a subsequent trial. These warnings
comported with the *Miranda* mandate. 384 *U. S.,* at *pp.*
476–479, 86 *S. Ct.,* at *pp.* 1628–1630, 16 *L. Ed. 2d,* at *pp.*
724–726; *State v. McKnight,* 52 *N. J.* 35 (1968). Magee
denied they were given, and said further that he did not even
see the captain until early the next morning after his arrest.
Clear corroboration of the captain's statement was furnished

by the officers who admittedly were present at the time. The trial court disbelieved the defendant and accepted as credible, and true the testimony of the captain and his men. It found that defendant's testimony generally did not ring true and that his witness-stand denials respecting the voluntariness and content of his confession were "fantastic." We agree with that finding and we note in further support of it defendant's unbelievable contradiction of the statements of his friends Carol Gibbons, Oldham and Debnan as to their activities with him in the early morning of the homicide.

Defendant stresses an incidental circumstance which he claims supports his alleged denial that the *Miranda*-type warnings were given. He points out that the homicide was committed on January 15, 1966 and *Miranda* was decided almost six months later, June 13, 1966. He contends it is highly improbable that whatever warnings were uttered by Captain Gourley could have anticipated *Miranda* to a sufficient degree to satisfy it. The argument seems to be that *Miranda* was such a radical departure from existing criminal law that police assertions that the full panoply of *Miranda* warnings was in fact given to defendant should be seriously suspect. The intimation is that the subsequent ruling of the United States Supreme Court in *Johnson v. State of New Jersey,* 384 *U. S.* 719, 86 *S. Ct.* 1772, 16 *L. Ed.* 2d 882 (1966), which made the *Miranda* rule applicable to cases tried after June 13, 1966, even though the crime occurred prior to that date, created the necessity and the stimulation for the police officers' testimony. The argument has a surface appeal. But it overlooks the current history of the criminal law and its almost day-to-day kaleidoscopic development. Against such a background we cannot accept as an incontrovertible fact that public authorities engaged in the administration of the criminal law have been insensitive to the direction of its progression. *Escobedo v. State of Illinois,* 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed.* 2d 977 (1964) had been decided in 1964. Although its scope was somewhat ambiguous, it indicated a growing con-

cern on the part of the Supreme Court for the rights of individuals who give confessions without the advice of counsel or without at least being made aware of the right to counsel. It is common knowledge that *Escobedo* was the subject of much discussion in newspapers, law reviews, periodicals and on television and radio. But more significantly, this Court in 1965 pointed to the "widespread belief in academic and other circles * * * that the Supreme Court * * * [would] in due course eliminate all confessions by unrepresented suspects in custody." *State v. Coleman*, 46 *N. J.* 16, 34 (1965). Although such a drastic innovation was not adopted, nevertheless the trend toward more protective measures to assure the voluntariness of confessions had become so apparent that the *per se* rule of exclusion could reasonably have been anticipated prior to its crystallization in *Miranda*. Moreover, long prior to *Miranda* our Court had declared that failure of the police to advise a suspect of his right to counsel is one of the factors to be considered on the issue of voluntariness of a confession. *Slate v. Naglee*, 44 *N. J.* 209, 222–23 (1965), rev'd on other grounds *sub nom., Garrity v. State of New Jersey*, 385 *U. S.* 493, 87 *S. Ct.* 616, 17 *L. Ed. 2d* 562 (1967); *State v. Billingsley*, 46 *N. J.* 219, 236 (1966).

Paterson police officers were not unique in utilizing the right-to-counsel warnings before *Miranda*. The practice had become fairly common in our sister states, and there are a substantial number of cases in the reports involving crimes committed before *Miranda*, in which the trial occurred thereafter, where the pre-confession warnings given satisfied the standard later made universally mandatory. See, *e. g., United States v. Hayes*, 385 *F. 2d* 375 (4 *Cir.* 1967); *Alexander v. United States*, 380 *F. 2d* 33 (8 *Cir.* 1967); *Commonwealth v. White, Mass.*, 232 *N. E. 2d* 335 (*Sup. Jud. Ct.* 1967); *People v. Lambo*, 8 *Mich. App.* 320, 154 *N. W. 2d* 583 (*Ct. App.* 1967); *Hernandez v. State*, 425 *S. W. 2d* 653 (*Tex. Ct. Crim. App.* 1968); *Torres v. State*, 422 *S. W. 2d* 741 (*Tex. Ct. Crim. App.*

1968); *Charles v. State,* 424 *S. W. 2d* 909 (*Tex. Ct. Crim. App.* 1967); *State v. Smith, Wash.,* 434 *P. 2d* 5 (*Sup. Ct.* 1967).

■ We are not persuaded in this case that defendant's reference to the time sequence between the homicide and the decision in *Miranda* adds probative force to his denial that he was advised about his Fifth and Sixth Amendment rights. In the final analysis the answer depends upon a comparative evaluation of the credibility of the police officers and Magee. In our judgment the trial court reached the correct answer just as our own independent study of the record satisfies us beyond a reasonable doubt that the *Miranda* commandments were met. It follows also that no basis exists for interference with the confirmatory verdict of the jury.

### (b) and (c)

The finding that *Miranda* had been complied with leaves for resolution the remaining broad question: Did Magee freely and understandingly waive his Fifth and Sixth Amendment rights in giving his oral and typewritten confessions?

When Magee was told of his right to be silent and to have a lawyer present, either retained or provided without cost to him, during the questioning, it is clear that he understood. As has been shown above, he had had experience with criminal and civil courts and process and the need for and advantage of lawyers. In fact, he was engaged at the very time in civil litigation and was represented by counsel of his own choice. Thus when he declined the services of an attorney, as we find he did, it was a deliberate and understanding choice.

The interrogation thereafter was neither oppressive, prolonged nor coercive. Even on the first night, Saturday, January 15, when Magee was subjected to it between 7:00 p. m. and 3:30 a. m., it was engaged in at intervals, and as the record shows, no one interview, nor all of them in combination, could be considered excessive, harassing or prolonged. We see no sign that his will was subjugated by it.

On the contrary, when the investigation was suspended at 3:30 A. M. defendant was standing by his claim of innocence, and whatever may have been the detectives' feeling about his truthfulness, he was booked only for sale of narcotics.

The testimony is convincing that there was no questioning at all during the day on Sunday, January 16 or until early evening on Monday, January 17. When Mahull visited Magee on Monday evening, bringing sandwiches and coffee, and remained with him in one of the interrogation rooms for an hour and a half, there is not the slightest support for a conclusion that his will was overborne. There is no doubt that Mahull made known to Magee what Carol Gibbons and Debnan had told the police of Magee's conversations with Gibbons and Debnan about his expected meeting with Camilla Johnson as well as his activities in connection with actual and ostensible searches for her before and after the time of her murder. It is undisputed also that during that interview Mahull made plain his belief that Magee had killed the girl, and asked him to admit it. But Magee was uninfluenced by the dialogue and remained steadfast in his claim of innocence. There is nothing to suggest that physical or mental coercion or intimidation was practiced by Mahull.

The following morning, Tuesday, January 18, when Mahull spoke to defendant, it was only to tell him that the arraignment on the narcotics charge would take place in a short while. He said nothing about the homicide and quite obviously gave no indication that any further questioning about it was imminent. At this point, according to Mahull, Magee made the unsolicited inquiry whether the detective was going to question him further about the killing. The detective's negative response brought forth the unsolicited but plain suggestion that he had killed Camilla, followed by the admission that he had thrown her coat and pocket book in a garbage can in New York City. As a result, the arraignment was. bypassed and Magee was taken immediately to Captain Gourley's office. Then he made a short oral confession, after which he agreed to take the officers over the

route he used in going to and from the scene of the crime to show them where the killing took place and where he had deposited the body.

Magee's denial at the trial that he offered the unsolicited admissions to Mahull was disbelieved by the trial judge, and in view of all of the circumstances present up to that moment, we find his conclusion fully supported. There can be no question that the arraignment on the narcotics charge was the first order of business scheduled for that Tuesday morning. Undoubtedly it would have been attended to if defendant's admissions had not intervened. His testimony that, instead of being arraigned, he was taken without a word to the captain's office and there told "they were going for a ride" over the course he had driven with his victim, does not square with the realities of the situation.

Defendant says that, assuming Captain Gourley did advise him of his right to be silent and to have counsel present when interrogated, the advice was given two and a half days before the critical Tuesday morning. He contends, therefore, that when he offered the unsolicited invitation for further questioning, Mahull was required to repeat the *Miranda* warnings before proceeding further. There is no such *mandate*. Once *Miranda's* rule has been complied with at the threshold of the questioning it is not necessary as a matter of law to repeat the warnings at each successive interview. "To adopt an automatic second-warning system would be to add a perfunctory ritual to police procedures rather than providing the meaningful set of procedural safeguards envisioned by Miranda." *People v. Hill,* 39 *Ill.* 2d 125, 233 *N. E.* 2d 367, 371 (*Sup. Ct.* 1968). In this connection the important factors are whether the suspect understood that he did not have to speak, the consequences of speaking, and that he had the right to counsel before doing so if he wished. A circumstance to be considered also is the period of time between the warnings and the volunteered inculpatory admission. Here the time lapse was short, and, as we have said, defendant was not a neophyte in court matters and the use of

counsel. The conclusion is inescapable that when he first suggested to Mahull he had committed the murder, throughout his first, short oral confession, the reenactment of the criminal event, and the detailed oral confession, his decision to do so was made freely and voluntarily and with a full awareness of his constitutional rights. Such statements are not banned by *Miranda*. As the Court said, "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 *U. S.*, at *p.* 478, 86 *S. Ct.*, at *p.* 1630, 16 *L. Ed. 2d* at *p.* 726.

■ That Magee was aware of his rights was demonstrated when, after giving the detailed oral confession, he was asked to formalize it in writing. Then he asked for an attorney. The request invoked *Miranda* and if he said nothing further it would have been improper to proceed with the typewritten confession. 384 *U. S.*, at *p.* 445, 86 *S. Ct.*, at *p.* 1612, 16 *L. Ed. 2d,* at *p.* 707. But he did not remain silent; he told the officers to go ahead with its preparation without waiting. Obviously he realized he had already given the full details of the crime orally. But upon its completion, before the attorney's arrival, either because of a belief that if he did not sign, it would not be admissible at a trial, or that the wiser course would be to have his attorney inspect it before he signed, he insisted upon waiting for his attorney. The refusal to sign, however, was not accompanied by any suggestion that the confession was untrue. He needed no rewarning or prompting about his entitlement to an attorney at that point. Both prior to that stage of the proceedings and during the preparation of the typed statement, he had of his own freely exercised volition, waived his invocation of his *Miranda* rights. And the unsigned confession, acknowledged by him to be truthful at the time of its completion, was admissible in evidence against him. *State v. McKnight, supra; State v. Yough,* 49 *N. J.* 587 (1967); *State v. Smith,* 27 *N. J.* 433, 458–59 (1958). Under the circumstances, we find nothing in *Miranda* which would deny admissibility to the un-

signed typed confession because of the possibility that if he had waited, his attorney would have advised him against giving it. In *State v. McKnight,* the defendant had been fully warned of his constitutional rights but thereafter, probably because he thought it would help him if he divulged the name of his confederate who had actually committed the murder in the course of their robbery, he gave a voluntary confession. Answering the post-conviction attack on the confession, the Chief Justice said:

"Specifically, if a prisoner is told that he has a right to say nothing and that what he says may be used against him, and that he has a right to an attorney and to his presence during any interrogation, at public expense if he is indigent, the objective of *Miranda* is fully met. It is irrelevant that the prisoner, so advised, chooses to speak without counsel because he misconceives his need for aid or the utility of a lawyer." (52 *N. J. p.* 47)

██ On the whole record here, we agree with the trial court that the State adequately met the "heavy burden" imposed by *Miranda* of showing that with full understanding of his constitutional safeguards, Magee consciously put them aside and confessed his guilt. From the confessions and the corroboratory evidence of guilt submitted during the trial the jury was amply justified in finding first degree murder had been proved beyond a reasonable doubt.

The judgment of conviction is therefore affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR and SCHETTINO—5

*For reversal*—None.