**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0122-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MAXIMO SANTIAGO,
a/k/a MAXIMO ROSAIRO,

     Defendant-Appellant.

_____

     Argued October 1, 2025 – Decided February 26, 2026

     Before Judges Currier, Berdote Byrne and Jablonski.

     On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 21-07-0790.

     Samuel Carrigan, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Samuel Carrigan, of counsel and on the brief).

     Linda A. Shashoua, Attorney, Special Litigation Unit, argued the cause for respondent (William E. Reynolds, Atlantic County Prosecutor, attorney; Courtney

Cittadini, Section Chief, of counsel and on the brief;
Linda A. Shashoua, on the brief).

PER CURIAM

Defendant Maximo Santiago appeals from a judgment of conviction entered after he was found guilty of first-degree murder, N.J.S.A. 2C:11-3(a)(1), second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1), and second-degree certain persons not to have a weapon because of a prior conviction, N.J.S.A. 2C:39-7(b)(1).  He also appeals his forty-year prison sentence with an eighty-five percent parole disqualifier under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, imposed for the murder conviction, and a concurrent sentence of five years of imprisonment subject to the Graves Act, N.J.S.A. 2C:43-6(c) for the weapons offenses. Finally, he appeals the Law Division's order denying his motion to suppress certain statements made to police.  After a careful review of the record and applying well-established legal principles, we affirm.

I.

On September 12, 2020, defendant found Marketa Thorpe (Thorpe) sleeping on the porch of his residence.  Defendant woke Thorpe and instructed her to leave the premises.  Thorpe refused.  Surveillance video shows Thorpe leaving the porch with an item, running across the street, and being followed

by defendant. The two then appeared engaged in a conversation or argument in the roadway. Thorpe subsequently moved to the opposite side of the street while defendant returned to his residence.

The same surveillance footage depicts Thorpe, at times holding a broom, lingering outside defendant's home, walking away, and later returning. Defendant was seen leaving the porch, briefly crossing the street, and returning to his residence, with Thorpe following him on at least one occasion.

At 11:20 a.m., Thorpe was standing in front of the residence speaking with defendant wearing a red shirt.

Defendant fired a rifle and hit Thorpe once as she stood on the sidewalk. At 11:22 a.m., the video shows Thorpe falling to the ground and remaining motionless. Defendant observed Thorpe from the porch before reentering his home.

An unidentified caller contacted emergency services and reported: "Hey yo, this man just shot this lady over here at [defendant's residence]. Shot her with a rifle." The caller described the suspect as "Hispanic dude that lives in that house right there. He got on a red shirt and blue pants."

One minute later, defendant emerged from the residence, stood briefly on the porch, reentered his home, and then exited again. He approached the

3

sidewalk, observed Thorpe, then crossed the street toward his vehicle. Police officers arrived and arrested defendant. Defendant was transported to the police station.

Defendant was placed in an interrogation room. When officers entered, one officer asked defendant whether he needed reading glasses when defendant stated, "I can't see too good," and provided him with a pair. The officer then read defendant his Miranda[1] rights. When asked whether he understood the rights read to him, defendant responded that he understood. He responded affirmatively when asked whether he wanted to waive his rights and answer the officers' questions.

The officer provided defendant with a Miranda waiver form to sign, but before he did so, the officer asked whether defendant could read the waiver form out loud. Defendant then informed the officers that he could not read English. The officers asked defendant if he could read Spanish, and he responded by telling them that he had to use the bathroom. The detective responded "okay" but then again asked whether defendant could read in Spanish. Defendant responded that he could not see well and said, "it's okay" and that if they were going to imprison him, then he would be put in jail. The

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0122-23

officer stated, "I want you to understand your rights," and again asked defendant if he wanted his <u>Miranda</u> rights to be read out loud a second time, and defendant responded with "that's okay" and said, "I tell you." The officer then asked defendant to sign the waiver form signifying that he understood his rights. Defendant was asked again whether he understood the rights that were read to him, and he responded, "yeah, I understand." Defendant ultimately signed the form.

The officers then informed defendant that they would check whether defendant could be taken to the bathroom, and he again stated that he had to use the restroom. Shortly after, the officers took defendant to use the restroom. When he returned, the officers asked defendant whether on the way to the bathroom he was asked any questions or whether he made any statements, and defendant responded in the negative to both questions. He was then reminded of his <u>Miranda</u> rights and the reading of his rights that occurred before he went to use the restroom. The officers again asked him whether he understood his rights and if he wanted his rights read to him again. Defendant said, "[t]hat's okay," and then stated that he "break [sic] the rule."

During the ensuing interrogation, conducted primarily in English, defendant stated that, earlier that day, Thorpe had threatened to burn his house

and kill him and had struck him with a broom. He also described prior incidents in which Thorpe had threatened or assaulted him and stolen from him. Defendant further explained that after finding Thorpe sleeping on his porch, he believed her presence was drug-related and told her to leave or he would notify police. He stated that Thorpe responded with a profanity directed at the police and struck him with the broom. Defendant reported that he attempted to take the broom from Thorpe, but she fled. He expressed concern for his partner, who was disabled and upstairs in the residence when Thorpe threatened to set fire to the house.

When asked about the shooting, defendant admitted and repeatedly emphasized he intended "to shoot her in the leg." When questioned further about his history with Thorpe, defendant stated he had known Thorpe and her family for approximately twenty years, and that the two had a prior sexual relationship. Defendant admitted to giving her money, described her as addicted to drugs, and referenced prior interactions with her family. Defendant posited feelings of jealousy as a possible motive for Thorpe's actions. When speaking about his relationship with Thorpe, defendant said "I'm going to hell" or "I'm going to help."

A-0122-23

On July 8, 2021, defendant was charged in a three-count indictment with (1) first-degree murder, N.J.S.A. 2C:11-3(a)(1); (2) second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); and (3) second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b).

Pre-trial, defendant moved to suppress the statements he made to the police. In a detailed and comprehensive twenty-four-page written opinion, the motion judge denied defendant's application concluding defendant's waiver of his Miranda rights was knowing, intelligent, and voluntary. The motion judge concluded:

> [T]he totality of the circumstances indicates [defendant] made a knowing, intelligent, and voluntary statement to detectives regarding the events that occurred on . . . September 12, 2020. Throughout the entire interview, [d]efendant spoke with the detectives in English. Defendant only utilized Spanish, or an interpretive of Spanish, twice. Absent those moments, the entire interview was in English. The [d]efendant's use of English appeared to be fluent and colloquial. His choice of words was appropriate to the context. Although [d]efendant's English is accented, he was coherent and straightforward in his statements. Upon viewing the video-recorded interview, [d]efendant appeared to be at relative ease speaking with detectives and provided a detailed discussion regarding the events leading up to the shooting . . . .
>
> Moreover, [d]efendant, with multiple prior convictions that presumably familiarized him with the criminal

justice system and insistence that [the officer] did not need to re-Mirandize him as he understood his rights, ultimately signed the Miranda card indicating that he was advised of and understood his rights and the waiver of same. As such, the [c]ourt finds and concludes that [d]efendant made a free and deliberate choice to waive his Miranda rights, as the record is devoid of any intimidation, coercion, or deception on behalf of the detectives. Quite the opposite occurred during the interview, with [the officer] extending the courtesy of providing [d]efendant reading glasses to assist him in reading and writing and [d]efendant answering any and all questions without periods of prolonged silence or unresponsiveness. Further, the [c]ourt finds and concludes that [d]efendant's waiver was made with full awareness that [d]efendant was facing criminal charges and detention; [d]efendant discusses this throughout the first half of the interview as he makes mention of going to jail and guilt.

Defendant was tried on the first two counts of the indictment before a jury.

In summation, the prosecutor stated:

Ladies and gentlemen, I suggest that this defendant has been victimizing [Thorpe] for many, many years. He was not afraid of her. He is the predator in this relationship. Now he wants you to think that he's the victim. But he knew exactly what he was doing. He provided a sense of safety. His was a house that she was sometimes welcome to visit. He would occasionally give her money. But then he would just as quickly turn and tell her to leave. He was not threatened by her. He was growing annoyed with her. Sick and tired of her. And he didn't want to deal with her anymore.

8

When the State concluded, defense counsel objected:

> Judge, I never object when someone's closing but I have a strong objection to something that [the prosecutor] said. Quote, unquote, that my client has been victimizing [Thorpe] for many years. Judge, that's completely inappropriate. It's 404(b) evidence, if that even, and I'm going to object to that for the record.

In response, the prosecutor explained that her remarks were a "characterization of [defendant's] explanation of their relationship beginning when [Thorpe] was thirteen. It was a statement that [she] was simply commenting on." Defense counsel replied, "Judge, I looked at the transcript regarding that and there's no admission to anything of this nature." The trial court judge concluded:

> It's not [N.J.R.E.] 404(b). It doesn't rise to that level. I think there are inferences that can be drawn from his relationship with her that . . . they could infer that there was a relationship, that she was a vulnerable person and over the years he may have engaged in a sexual relationship, would buy drugs, that he's known her since she was a young girl, and you know, that she may have been a victim. I'm not going to strike it. I think there's enough there that they can make the inference. At the end of the day it's up to them to judge the record . . . . I don't think it was improper . . . .

The trial judge also instructed the jury:

As I instructed you when we started this case, I explained to you that you are the judges of the facts, and as the judges of the facts you are to determine the credibility of the various witnesses as well as the weight to be attached to their testimony. You, and you alone, are the sole and exclusive judges of the evidence, of the credibility of the witnesses, and the weight to be attached to the testimony of each witness. Regardless of what counsel said or what I may have said recalling the evidence in this case, it is your recollection of the evidence that should guide you as judges of the facts.

Arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence. Although the attorneys may point out what they think important in this case, you must rely solely upon your understanding and recollection of the evidence that was admitted during the trial. Whether or not the defendant has been proven guilty beyond a reasonable doubt is for you to determine based on all of the evidence presented during the trial. Any comments by counsel are not controlling. It is your sworn duty to arrive at a just conclusion after considering all of the evidence which was presented during the course of the trial.

The jury ultimately convicted defendant of first-degree murder and second-degree unlawful possession of a weapon. Defendant waived his right to a jury trial on the remaining count of the indictment and was convicted of the certain persons charge following a bench trial.

At sentencing, the trial judge merged the weapons conviction with the murder charge. The judge found aggravating factors three, defendant's risk of

reoffending, N.J.S.A. 2C:44-1(a)(3); six, defendant's prior record and the seriousness of the offenses, N.J.S.A. 2C:44-1(a)(6); and nine, the general need for deterrence, N.J.S.A. 2C:44-1(a)(9) applied. The court only found mitigating factor seven and recognized the substantial period the sixty-seven year old defendant led a law-abiding life before his conviction of the present offense, N.J.S.A. 2C:44-1(b)(7). Finding the aggravating factors outweighed those in mitigation, the trial judge sentenced defendant to forty years' imprisonment subject to NERA. The judge also imposed a concurrent five-year prison term under the Graves Act, with a parole ineligibility period of five years for the certain persons charge.

Defendant appealed and raises three contentions:

Point I

The trial court erred when it did not give a curative instruction or strike the Prosecutor's summation remark- which was without a basis in the record- that [defendant] was a "Predator" who had victimized the decedent "for many, many years."

Point II

The trial court erred in its Miranda waiver determination where the State did not prove voluntariness beyond a reasonable doubt.

 A-0122-23

Point III

The sentence is excessive.

## II.

When we review a "claim of prosecutorial misconduct with respect to remarks in summation, the issue presented is one of law . . . [and our] review is plenary and de novo." State v. Smith, 212 N.J. 365, 387 (2012). "It is axiomatic that '[t]he duty of the prosecutor is as much . . . to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.'" State v. Supreme Life, 473 N.J. Super. 165, 171-72 (App. Div. 2022) (alteration in original) (quoting State v. Williams, 244 N.J. 592, 607 (2021)). Therefore, "[w]hile 'prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries' and are 'afforded considerable leeway,' 'their comments [should be] reasonably related to the scope of the evidence presented.'" Id. at 172 (alteration in original) (quoting Williams, 244 N.J. at 607). "It is . . . improper for a prosecutor to use derogatory epithets to describe a defendant." Id. at 174.

"[E]ven when a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end." Id. at 172 (quoting State v. McNeil-Thomas, 238 N.J. 256, 275 (2019)). "[We must] weigh the severity of the

A-0122-23

misconduct and its prejudicial effect on the defendant's right to a fair trial[.]" Ibid. (quoting McNeil-Thomas, 238 N.J. at 275). Our task is to "take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." Ibid. (quoting Williams 244 N.J. at 608). "[T]here must have been 'some degree of possibility that [the prosecutor's] comments led to an unjust result.'" Ibid. (quoting McNeil-Thomas, 238 N.J. at 276).

Applying this standard, we conclude that the State's references to the characteristics of the parties and the nature of their relationship did not constitute prosecutorial misconduct. The remarks by the State that defendant argues are problematic were responsive to arguments raised specifically or by implication in defendant's summation. Specifically, the statements, including the single characterization of defendant as a "predator in this relationship," were neither egregious nor inflammatory—especially since both sides acknowledged the existence of the relationship to the jury. When viewed in context, along with other related comments by the State, the reference appears to be intended to highlight the unequal balance of power between defendant and Thorpe. This imbalance undermines defendant's claims of self-defense or defense of others.

In summation, defense counsel initially argued:

> Also consider what [defendant] is faced with? What is coming at him? Well, it's [Thorpe]. Thirty-two years old, half his age, a convicted felon for violent crimes . . . consider that for the fact that that could establish that she was the aggressor in this situation, making it more likely that she was, in fact, using unlawful force . . . . This is a woman that's half of defendant's age who has an old bullet lodged in her body from who knows what and has a pretty high amount of fentanyl in her system.

The State responded directly:

> [Defendant] doesn't look frightened. And she walks after him. Neither one of them is running. I suggest to you here, he doesn't run away from her. He doesn't spring back to his house, because again, he is not afraid of her. He has known her for over twenty years, since she was thirteen. And I know some of you noticed that in the interview in the confession he gave. When detectives asked him, how long have you known her, he said, oh a long time . . . probably since she was about thirteen. And then he said, I knew her father. He smirked and said, I'm going to hell.
>
> The detectives immediately realized what he was saying and they followed up with, well how long have you been having sex with her? And he said, I don't know, a long time . . . .
>
> Ladies and gentlemen, I suggest that this defendant has been victimizing [Thorpe] for many, many years. He was not afraid of her. He is the predator in this relationship. Now he wants you to think that he's the victim. But he knew exactly what he was doing.

14

As detailed in the discussion following defendant's objection, the State explained that its references to the parties, the nature of their relationship, and the age disparity between them constituted fair comment on the evidence. The trial judge agreed and issued an instruction to the jury as part of its charge that followed immediately after defendant's objection. The judge reminded the jury that counsel's remarks made during summation were not evidence and should not be considered in their deliberations.

We conclude that the court's instruction was both timely and appropriate and effectively mitigated any prejudicial impact of the sole reference. We presume that the jury followed the judge's directive. See State v. Loftin, 146 N.J. 295, 390 (1996). Therefore, under the circumstances, and especially in light of other overwhelming evidence of defendant's guilt captured on the video footage, we reject defendant's assertion that the fleeting commentary during the prosecutor's closing argument warrants a new trial.

III.

Next, defendant asserts the trial court erred in admitting his interrogation statement because his Miranda waiver was invalid. We disagree.

"Our review of a motion to suppress is limited and deferential." State v. Bullock, 253 N.J. 512, 532 (2023). Thus, "we defer to the factual findings of

15

the trial court if those findings are supported by sufficient credible evidence in the record." Ibid. (quoting State v. Sims, 250 N.J. 189, 210 (2022)). That "deference recognizes the trial court's 'opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting State v. Elders, 192 N.J. 224, 244 (2007)). "A trial court's legal conclusions, 'however, and the consequences that flow from established facts,' are reviewed de novo." Ibid. (quoting State v. Hubbard, 222 N.J. 249, 263 (2015)).

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this [S]tate's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and . . . N.J.R.E. 503." Ibid. (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)).

A "person who is 'subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way,' 'must be adequately and effectively apprised of his rights[.]'" Bullock, 253 N.J. at 532 (quoting Miranda, 384 U.S. at 467, 477). "[A] confession or incriminating statement obtained during a custodial interrogation may not be admitted in[to] evidence unless a defendant has been advised of his or her constitutional rights." Id. at 533 (quoting Hubbard, 222 N.J. at 263).

A-0122-23

A defendant may waive his <u>Miranda</u> rights.  To be effective, however, the State must prove beyond a reasonable doubt that a defendant's waiver was given knowingly, intelligently, and voluntarily.  <u>Nyhammer</u>, 197 N.J. at 400-01.  A court evaluates whether the State has satisfied its burden by considering the "totality of the circumstances surrounding the custodial interrogation based on the fact-based assessments of the trial court."  <u>State v. A.M.</u>, 237 N.J. 384, 398 (2019) (citing <u>State v. Presha</u>, 163 N.J. 304, 313 (2000)).  The totality of the circumstances requires this court to consider the following factors: "defendant's 'age, education, and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved.'"  <u>Sims</u>, 250 N.J. at 217 (quoting <u>Nyhammer</u>, 197 N.J. at 402).  When applying this standard, "'knowledge' is always a relevant factor," but "because the right is against compelled self-incrimination, 'knowledge' can be best understood as a condition of 'voluntariness,' which itself denotes the absence of 'compulsion.'"  <u>State v. Reed</u>, 133 N.J. 237, 255-56 (1993).  When assessing the validity of a <u>Miranda</u> waiver, trial courts must decide "whether the suspect understood that he did not have to speak, the consequences of

17

speaking, and that he had the right to counsel before doing so if he wished." Nyhammer, 197 N.J. at 402 (quoting State v. Magee, 52 N.J. 352, 374 (1968)).

Defendant contends the motion judge erred in determining that his waiver of his Miranda rights was voluntary. He asserts that his difficulties with the English language and his request to use the bathroom before he waived his rights impaired his ability to waive his rights validly. He further argues that the officers' decision to continue seeking his waiver after hearing his request may have created the impression that his basic needs would be denied unless he relinquished his constitutional rights. As a result, defendant claims that the motion court's decision to admit his statements was erroneous and deprived him of a fair trial. This requires a reversal of the judgment of conviction. We disagree.

The record contains sufficient credible evidence demonstrating that defendant was properly advised of his Miranda rights, and that his waiver of those rights was made knowingly and intelligently and voluntarily under the totality of the circumstances. The officers who conducted the interrogation read the Miranda rights aloud to defendant in English and repeatedly asked whether he understood them. Defendant responded, "me understand [sic] that." After reading the rights initially, one of the officers offered to read them

again, both immediately and once more when defendant returned from using the restroom. Each time, defendant indicated it was "okay." Although the motion judge noted that defendant spoke with accented English, his responses to the officers were appropriate and demonstrated his understanding of the questions. When defendant explained he had difficulty reading the Spanish Miranda form, an officer provided him with reading glasses. Throughout the interview, defendant did not request an interpreter nor did he ask for any assistance to translate from English to Spanish. As the trial court found, "[t]hroughout the entire interview, [d]efendant spoke with the detectives in English. Defendant only utilized Spanish, or an interpretive of Spanish, twice." The court further noted defendant's use of English was "fluent and colloquial."

Despite defendant's argument that he was placed into a coercive atmosphere, the record reveals the officers took efforts to ensure defendant was safe and secure. The officers offered defendant water and asked if he felt comfortable speaking to them without a face mask in light of the COVID-19 pandemic. The interrogating officer also inquired about his medical needs. When defendant mentioned he was diabetic, the officer asked when defendant last took insulin and inquired about his physical health. Although the officers

19

did not immediately escort defendant to the bathroom after he stated his need to use those facilities, defendant expressed both his understanding and his waiver of his <u>Miranda</u> rights before making that request. Furthermore, defendant was only required to wait minutes before his request to use the restroom was granted.

Therefore, considering the evidence in totality, we conclude the State established, beyond a reasonable doubt, that defendant knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights.

IV.

Finally, defendant argues his forty-year prison sentence with an eighty-five percent parole disqualifier under NERA is excessive because defendant's "advanced age was not given the substantial weight it deserved." Specifically, defendant argues the trial judge erroneously balanced the aggravating and mitigating factors. We disagree and are satisfied the judge gave a well-reasoned explanation for imposing the sentence that was amply supported by the evidence in the record.

When we review a trial court's imposition of a defendant's sentence, we look to see if the court misapplied its discretion. <u>State v. Jones</u>, 232 N.J. 308, 318 (2018). The sentencing court's "discretion in that area is bounded by the

law and court rules." Ibid. (quoting State v. Tedesco, 214 N.J. 177, 188-89 (2013)). Therefore, we affirm a defendant's sentence unless "(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" State v. Fuentes, 217 N.J. 57, 70 (2014) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). We do not "substitute [our] judgment for that of the sentencing court." Ibid.

Consideration of the statutory aggravating and mitigating factors is a crucial part of the deliberative process at sentencing. State v. Dalziel, 182 N.J. 494, 505 (2005); State v. Cassady, 198 N.J. 165, 180 (2009). To that end, trial courts must "explain and make a thorough record of their findings to ensure fairness and facilitate review." State v. Comer, 249 N.J. 359, 404 (2022). "Proper sentencing . . . requires an explicit and full statement of aggravating and mitigating factors and how they are weighed and balanced." State v. McFarlane, 224 N.J. 458, 466 (2016) (quoting State v. Randolph, 210 N.J. 330, 348 (2012)). See also State v. Case, 220 N.J. 49, 66 (2014) ("[C]ritical to the sentencing process and appellate review is the need for the sentencing court to

explain clearly why an aggravating or mitigating factor presented by the parties was found or rejected and how the factors were balanced to arrive at the sentence.")  "After balancing the factors, the trial court may impose a term within the permissible range for the offense."  State v. Bieniek, 200 N.J. 601, 608 (2010).  We do not "'substitute [our] assessment of aggravating and mitigating factors' for the trial court's judgment."  State v. Miller, 205 N.J. 109, 127 (2011) (quoting Bieniek, 200 N.J. at 608).

Here, the trial court applied aggravating factors three, six, and nine.  The trial court also considered and applied mitigating factor seven.  Following substantive consideration, weighing of the factors, and his prior indictable convictions, it concluded defendant's "conduct escalated abruptly and dangerously."  The trial court held it was a "virtual certainty [defendant] will re-offend if given the opportunity."  After the appropriate merger, the trial judge sentenced defendant within the permissible range -- forty years' imprisonment subject to twenty-five years' of parole ineligibility under NERA, and a concurrent five-year prison term pursuant to the Graves Act, for the "certain persons" count.  The court concluded that the "total sentence imposed is warranted and necessary to protect the public from this dangerous and violent recidivist."

Defendant further argues the trial court failed to consider the "real time consequences" of a period of NERA imprisonment. We disagree.

NERA provides that individuals convicted of first-degree, second-degree, and certain enumerated offenses must serve at least eighty-five percent of their custodial sentence without eligibility for parole. N.J.S.A. 2C:43-7.2. When sentencing a defendant to a NERA custodial term, the sentencing court must "be mindful of the real-time consequences of NERA and the role that it customarily plays in the fashioning of an appropriate sentence." State v. Marinez, 370 N.J. Super. 49, 58 (App. Div. 2004). In analyzing real-time consequences, the sentencing court must weigh the aggravating and mitigating factors. Ibid.

Here, we discern no misapplication of discretion in the judge's evaluation and consideration of the aggravating factors in light of the mitigating factors proposed by defense counsel and that the court ultimately rejected. Mirroring the trial judge's assertion that she considered the "real time consequences" of NERA sentencing, the judge proceeded to give both quantitative and qualitative consideration to the proffered aggravating and mitigating factors.

A-0122-23

Here, the trial court acknowledged defendant was sixty-seven years of age and observed his prior employment history and limited formal education. The judge observed defendant's marital status and that he had a family, and considered his health status and substance abuse history determining defendant had good mental health but poor physical health.

The trial court also acknowledged defendant's extensive criminal history which included three prior indictable convictions. The trial court noted specifically defendant's abrupt and escalating offenses involving violence against women and unlawful weapon's possession.

The trial court's findings regarding aggravating factors are amply supported by the record, given the seriousness and escalation of defendant's conduct, the substantial risk of recidivism, and the need for deterrence. Therefore, we discern no error in the trial court's determination that mitigating factors related to justification or inducement were not established, though the remoteness of some prior convictions and periods of law-abiding conduct were properly weighed for moderate mitigation.

The trial court's detailed evaluation of the circumstances surrounding the offense, and its comprehensive consideration of defendant's history and present circumstances demonstrates the trial judge thoughtfully accounted for the real-

24

time consequences of a NERA sentence.    Therefore, we discern no misapplication of discretion in the judge's conclusions and determine each was based on competent and credible evidence in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Hanley*

Clerk of the Appellate Division

A-0122-23