# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1591-17T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

P.J.M.,

     Defendant-Appellant.

_____

Argued March 20, 2019 – Decided January 22, 2020

Before Judges Fuentes, Accurso and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 16-01-0064.

Joseph J. Russo, Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stephen W. Kirsch, Assistant Deputy Public Defender, of counsel and on the brief).

Evgeniya Sitnikova, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Evgeniya Sitnikova, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

A Cumberland County grand jury returned an indictment against defendant P.J.M. charging him with first degree aggravated sexual assault, N.J.S.A. 2C:14-2a(1), and second degree endangering the welfare of a child, N.J.S.A. 2C:24-4a(1). Defendant is the paternal uncle of A.J.C. (Amelia)[1], the victim of these crimes. According to Amelia, defendant sexually assaulted her between November 6, 2006 and November 5, 2009, when she was between six and eight years old.

The indictment also contained three additional counts charging defendant with second degree sexual assault, N.J.S.A. 2C:14-2b; first degree aggravated sexual assault N.J.S.A. 2C:14-2a(1); and second degree endangering the welfare of a child, 2C:24-4a(1). The victim of these crimes, J.C., claimed defendant sexually assaulted her in the City of Bridgeton between June 17, 2007 and June 16, 2008 when she was between eight and nine years old.

The allegations made by these two children were considered two separate incidents. The State decided to try the charges involving Amelia's allegations

---

[1] Pursuant to Rule 1:38-3(c)(9), we use pseudonyms or initials to protect the privacy of the children and members of their family who have the same last name.

A-1591-17T1

first. A petit jury convicted defendant of first degree aggravated sexual assault and third degree endangering the welfare of a child, as a lesser included offense of second degree endangering the welfare of a child.[2] The trial court thereafter granted the State's motion to dismiss the three charges involving J.C., which were reflected in counts three, four, and five of the indictment.

At the sentencing hearing, the trial court merged the third degree endangering the welfare of a child conviction with the first degree aggravated sexual assault and sentenced defendant to a term of sixteen years, with an eighty-five percent period of parole ineligibility and five years of parole supervision as required by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.1.

---

[2] N.J.S.A. 2C:24-4(a)(1) provides:

> Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who engages in sexual conduct which would impair or debauch the morals of the child is guilty of a crime of the second degree. Any other person who engages in conduct or who causes harm as described in this paragraph to a child is guilty of a crime of the third degree.
>
> [(Emphasis added).]

Because defendant was convicted of third degree endangering the welfare of a child, we infer the jury found the State did not prove, beyond a reasonable doubt, he had "a legal duty" or had "assumed responsibility for the care of" Amelia at the time he sexually assaulted her.

In this appeal, defendant alleges that while he was detained in the County Jail in connection with these charges, a representative of the Division of Child Protection and Permanency (Division) "interrogated" him concerning the allegations made by his niece without first informing his attorney and without advising him of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Defendant also argues that the trial judge erred in denying his motion to suppress an incriminating statement he made to the Division caseworker.

The judge found the Division caseworker was acting on behalf of the State but was not conducting a criminal investigation at the time she interviewed defendant. The judge also found that the law enforcement agents who interrogated defendant apprised him of his rights under Miranda at the time he was arrested, six weeks before his interactions with the Division caseworker. The motion judge held this waiver remained in full force and effect at the time defendant was interviewed by the Division caseworker.

The State argues we should uphold the judge's findings because they were based on his assessment of defendant's understanding under the totality of the circumstances and there is "no bright-line rule" that establishes when the State is required to re-administer Miranda warnings. According to the State, the judge properly found that additional warnings were not warranted "because the time

4

interval between the interviews on its own did not vitiate the existing warning."

After reviewing the record developed before the motion judge, we reverse.

I

The Investigation

On April 7, 2014, Amelia's younger sister A.C. (Anita) attended a child abuse prevention program held at her elementary school. At the conclusion of the program, Anita approached the school's counselor, Maria Lopez, and told her she overheard a conversation her older sister Amelia had with their mother about sexual abuse. Counselor Lopez reported Anita's allegations to the Bridgeton Police Department.

Bridgeton Detectives Kenneth Leyman and Miguel Martinez were dispatched to the school that same day to investigate. After speaking to Counselor Lopez, the detectives drove to Amelia's residence. After briefly discussing the allegations with Amelia and her mother, the detectives decided to take them to the Bridgeton police station to interview them formally. Amelia was thirteen years old at the time. Detective Leyman testified that Counselor Lopez told him the family was a "Spanish speaking . . . household[.]" Detective Martinez spoke Spanish and was prepared to interpret in the event Amelia or her mother had any difficulty understanding English or expressing themselves in

English. However, Detective Leyman testified that Amelia was "very fluent" in English.

According to Detective Leyman, Amelia was very upset and "basically started to cry" when he asked her if she knew why she was there. He described her demeanor throughout the interview as "[v]ery solemn." She "sobbed a lot[,] . . . [w]as unable to keep her eyes up[,] . . . [and] [was] just very, very distraught." Notwithstanding her distressed emotional state, Detective Leyman testified that Amelia was eventually able to describe what occurred. She told Detective Leyman that defendant began to sexually molest her when she was approximately six years old and continued until she was eight.

Because Amelia "was unable to verbalize some of the information, due to the fact that she was crying[,]" Detective Leyman "offered her a pen and a pad of paper[.]" As part of his direct examination, the prosecutor did not ask Detective Leyman to produce the paper or disclose what Amelia wrote. In response to defense counsel's cross-examination, Detective Leyman testified that Amelia only wrote "sexual intercourse" on the piece of paper. Defense counsel pursued this line of questioning with Detective Leyman:

> Q. Okay. So she never actually said he touched me, he did this to me, he put his penis inside of me. She never actually said those words to you; correct?

6

A. During the interview she described the scenario little by little. I mean, there were words exchanged. As time went on, she was able to answer questions. She just wasn't able to give elaborate answers on those questions verbally.

Q. Okay. So you didn't actually get a lot of detail from her. Is that correct?

A. Not at that time, no.

Q. Was there ever a point in time where you interviewed her again and got more detail?

A. Well, the -- as to location, things of that nature, but during the --

Q. But you never actually got more detail as to what actually happened to her; correct?

A. I was able to get the abuse scenario; the position, where it happened, as far as not location geographically but the area that -- or what they were in at the time of the assaults. I was able to get the positions of the sexual encounters, as far as their positioning to one another being missionary. I was able to determine how their clothing was positioned during that time.

Q. Okay. Let's talk about that. In regards [sic] to her clothing, it's fair to say that she told you that they were both undressed from the waist down. Is that correct?

A. Yes, ma'am.

Q. She said that neither of them had any pants on?

A. Yes.

A-1591-17T1

Detective Leyman characterized Amelia's mother's attitude as "supportive." Conversely, he described Amelia's father's demeanor as "indifferent" and defensive of his brother. According to Detective Leyman, Amelia's father did not believe his daughter's allegations against defendant.

## II

### Complaining Witness' Testimony

Amelia was sixteen years old at the time she testified at defendant's trial. It is undisputed that defendant resided with Amelia and her family at the time she claimed he sexually assaulted her. Amelia testified she was six years old when she accompanied defendant to the laundromat on a regular basis to wash the family's clothes. The prosecutor asked Amelia to describe what occurred on these trips to the laundromat:

> Q. Okay. [Amelia], was there a time when . . . your uncle did something to you when you were on one of those errands?
>
> A. Yes.
>
>     . . . .
>
> Q. Did he do something to you?
>
> A. Yes.
>
> Q. Was this something that made you feel bad?
>
> A. (No audible response)

A-1591-17T1

Q. You're nodding your head. You've got to give an answer.

A. Yes. Yes.

. . . .

Q. Okay. Can we start with maybe where it might have happened? Where would it happen?

A. It was like, okay, there was one time at the laundromat and the other times would be at, like, a deserted area or near like an ocean or like a sea.

Q. Okay. Okay. Now, you're talking about a couple of times. How many times . . . did your uncle do something to you?

A. I can't count how many times but it was many times.

When the prosecutor asked her to "roughly" recall how many times, Amelia responded: "[s]ix . . . maybe around eight" times over approximately two years. Amelia also testified that these encounters occurred in Greenwich Township. Amelia testified that she took Detective Leyman to the places where defendant sexually assaulted her. When asked how she was able to remember, Amelia explained: "Because we went by car and there [were] windows around and I could see like around, and also there were some places that were where me and my dad go fishing." She also said defendant took her to these places when they were the only two people in the minivan.

The prosecutor provided Amelia with a copy of the transcript of her interview by Detective Leyman to refresh her recollection. After Amelia reviewed the statements she made at that time, the prosecutor asked her to describe what occurred. Amelia testified that defendant would first park the minivan and exit the vehicle from the driver-side door. She described how the sexual assaults occurred in response to the prosecutor's questions:

> Q. Okay. And then where would he go?
>
> A. He would shut the door and then he would go around to the -- there was a slide door. Then he would open the door.
>
> Q. Okay. And where were you at that point?
>
> A. Well, it was a slide door and then I would be seated on the back seat.
>
> Q. Would he ever -- well, talking about this in -- first incident, if you can remember. You're on the seat. Does he position you in a certain way?
>
> A. Yes.
>
> Q. And how was that?
>
> A. My back would always be on the seat.
>
> Q. So would he lay you down on your back –
>
> A. Yes.
>
> Q. -- on the seat?

 A-1591-17T1

A. Yes.

At this point, defense counsel requested a sidebar conference. Although this part of the transcript contains a number of "inaudible" references in lieu of actual words, it appears defense counsel objected and argued the prosecutor was improperly asking leading questions. The trial judge overruled the objection and the prosecutor resumed her direct examination of the witness. Amelia described how defendant would lay her down on her back and take down her "undergarment." Because this "was like a regular-type thing," Amelia testified that sometimes she "would just take them off." When asked to clarify, Amelia stated that her underwear "would be below my ankles. Since I'm laying down, my ankles would touch the floor."

The prosecutor asked Amelia to describe what happened next:

A. I would hear his zipper go down and he would take
down his pants.

Q. And then what would happen?

A. And then he would take out his –

Q. He would take -- you have to say the word? He
would take out his what?

A. God. He would take out his --

Q. Do you know what word you want to use?

A. Yes.

Q. Do you have an answer?

A. Yes. His penis.

Q. And after he would remove his penis, what would he do? Remove his penis from his pants, I should say.

A. He would put it inside my vagina.

Q. Would he say anything to you while he did this to you?

A. No.

Q. And this was what you can remember being the first time the [d]efendant did this to you?

A. Yes.

Q. Now, you said that . . . it happen[ed] a number of times over two years. Was this how it always happened?

A. Yes.

III

Complaining Witness's Father's Testimony

Amelia's father D.J.A. (Diego), who is also defendant's brother, testified as a witness for the State. He testified that starting in either 2003 or 2005, defendant lived with him, his wife, and his two daughters, Amelia and Anita, for a period of seven years. He also confirmed that defendant owned a minivan and would take Amelia with him to the laundromat. When the prosecutor asked

12

him about his relationship with defendant, Diego responded: " [w]e love each other a lot."

Diego testified that he did not believe his daughter when his wife first told him that Amelia had accused his brother of sexually assaulting her. He testified that he asked Amelia directly "what happened" several times; but "she did not tell [him] anything." He also claimed he "felt bad" when the police officers came to his house and told him that Amelia alleged defendant had sexually assaulted her. Diego decided to personally confront his brother about these allegations "a couple of days" after he was arrested. This prompted the following questions by the prosecutor:

> Q. Okay. And why do you talk to him?
>
> A. Because I was going to ask him for the truth. If it happened or if it did not happen.
>
> Q. And by the truth, are you referring to the allegations that [Amelia] made?
>
> A. Yes.
>
> Q. Did you ask him if it were true?
>
> A. Yes.
>
> Q. And what did he tell you?
>
> A. He responded that it was true.
>
> Q. How was your brother's emotion when he said

that to you?

A. He said that, I felt very bad. I don't know how
to --

Q. Did you see him act in a certain way?

A. Yes.

Q. And how was that?

A. He -- when I went to see him in -- at the jail,[3] he
started crying.

The prosecutor concluded his direct examination by asking Diego whether defendant ever said anything to him "about forgiveness" during this conversation. Diego testified that defendant specifically asked him for his forgiveness.

On cross-examination by defense counsel, Diego testified that he helped defendant monetarily even after he told him he sexually molested Amelia. Diego also testified that after defendant was arrested "the police and people from the Prosecutor's Office" came to his house and told him that he had to be supportive of Amelia. Diego also claimed these same State agents warned him

---

[3] Diego's disclosure of defendant's detention status prompted defense counsel to move for a mistrial. At a sidebar conference, defense counsel emphasized that the witness had been previously instructed not to mention defendant's detention status in the presence of the jury. The judge characterized the witness' testimony as "a passing reference" that was "not overly prejudicial" and summarily denied the motion.

A-1591-17T1

"about things that could happen" if he did not believe Amelia's account of the events. Finally, in response to defense counsel's questions, Diego testified that he did not disclose to the police the conversation he had with defendant at the jail until 2015.

IV

Division Investigator's Testimony

The State also called as a witness Division caseworker and investigator Mila Tirado. She described her primary responsibility is "[t]o ensure the safety of the children." This broad mandate includes investigating allegations of sexual abuse of children. At the time the trial began in February 2017, Tirado had been employed by the Division in this capacity for six years. She was assigned to investigate the allegations of sexual abuse made by Amelia against defendant. She was also aware that the Bridgeton Police Department was investigating the same allegations to determine whether a crime had been committed.

Tirado testified, however, that she was charged by the Division to conduct an independent investigation "[t]o make sure that the parents weren't abusive or weren't neglectful, or anybody in a caregiver role." In this capacity, Tirado testified that even "if there is a substantiation of abuse, whether it's sexual or physical[,]" she does not file criminal charges against the abuser. She testified

15

that only law enforcement agencies were authorized to determine whether a crime has been committed.

Tirado explained that she was tasked with investigating the allegations of sexual abuse against defendant because he had at times functioned as a caregiver to Amelia. In response to the prosecutor's question, Tirado also made clear that she was fluent in Spanish because it was the dominant language in her home and consequently her "first language" as a child. She did not have any difficulty communicating with defendant or Amelia's parents.[4]

Tirado testified that according to established Division protocols, a caseworker assigned to investigate allegations of child sexual abuse must allow criminal law enforcement investigators to take the "lead role." She explained that law enforcement investigators who are charged with investigating these crimes are specially trained to interview children. After speaking with the lead detective in the Bridgeton Police Department on April 8, 2014, she began her own independent investigation. However, Tirado emphasized "that I'm allowed to go out and see the children. I just can't talk about the actual sex abuse. I can ask general safety questions."

---

[4] Both of Amelia's parents testified at trial through court certified Spanish language interpreters. Defendant was also provided with an interpreter throughout the trial.

In accordance with Division policy, Tirado testified she was also required to interview the alleged perpetrator. She testified that she had interviewed "hundreds" of alleged perpetrators during her career as a Division investigator. Tirado also made clear that she did not receive any direction about how to interview defendant from the Bridgeton Police Department or the Cumberland County Prosecutor's Office. In response to the prosecutor's question, Tirado testified that she did not audio-record her interview with defendant because she was not required to do so by the Division.

She also testified that during the interview, she identified herself as a Division investigator and told defendant that "[m]y purpose in speaking with him was to see if any abuse occurred . . . [t]o get his side of the story." She did not advise defendant of his rights under Miranda before starting the interview. She conducted the interview in Spanish and did not have any difficulty communicating with defendant. When she asked defendant "what happened between him and [Amelia]," he merely responded that "he made a bad decision." When she asked him whether he had had "sex with her", he answered: "[y]es."

Tirado testified that defendant was aware that Amelia had filed a complaint against him accusing him of having sexually molested her. Tirado testified that she asked defendant to describe the details of the sexual abuse. In

response to the prosecutor's questions, Tirado elaborated on what defendant allegedly told her:

> A: [T]he devil got a hold of his mind. No, he -- the devil got a hold of him and he lost his mind. I'm not exactly sure if it -- what. It's in my report but, you know, exactly what came first. I think he said the devil got a hold of him and that he lost his mind.
>
> Q. Was that something that he said to you once?
>
> A. He kept saying it. He kept repeating that, you know, he lost his mind.
>
> Q. Now, again, by way of the [d]efendant's demeanor, can you describe his demeanor during the interview with you?
>
> A. His -- he just seemed taken back, a little shocked, nervous.
>
> Q. And is this -- you said you did a good number of interviews. Is this behavior common with these kinds of interviews?
>
> A. Yes.
>
> Q. Now, Ms. Tirado, did you ask him anything else in regards to the abuse?
>
> A. Well, I asked him for details but he didn't respond.
>
> Q. So did you ask him a number of times for additional details?
>
> A. Yes.

18

Q. And those answers that you just gave us, were those answers that he gave in response to your questions?

A. Yes.

Q. Did he indicate to you whether or not he had made a mistake?

A. Yes. Yes.

Q. And what was it that he said?

A. I don't recall the exact words.[5]

Okay. He said that he made a mistake with her and he was not sure why.

On cross-examination, Tirado testified her interview took approximately twenty-five minutes. By contrast, her thirteen-page investigation report of the incident dedicated only a two-sentence paragraph to defendant's interview. Tirado also testified that she took notes during her interview but did not provide a copy to either the Prosecutor's Office or defense counsel. Furthermore, although she typed "what happened with the interview right away[,]" she completed her report "two weeks after."

Tirado testified that she was in contact with the police "from the time . . . these allegations were initially made." She also watched the video record of

---

[5] To refresh her recollection, the prosecutor showed the witness a Division Investigation Report, which had been previously marked for identification.

Amelia's interview conducted by the detectives who were investigating the allegations and asked them for a copy of the child's statement. Tirado also interviewed Amelia "as well as the other children [who] were in the home." In response to defense counsel's question, Tirado elaborated on the substance of the "safety questions" she asked the children, including Amelia:

> Q. What do those general safety questions include?
>
> A. Do they feel safe in their home? Are they afraid of anyone? Forms of discipline?
>
> Q. Do you ask them whether or not they've been touched inappropriately by anybody inside of the house?
>
> A. Yes.
>
> Q. Do you also ask them whether or not they've been touched inappropriately by anybody at all, not just somebody inside the house?
>
> A. Yes.
>
> Q. And are those safety questions standard questions that you ask when you go out for any investigation?
>
> A. Yes.

Returning to the thirteen-page Division report Tirado submitted in this case, defense counsel asked Tirado about certain allegations Amelia made to a pediatrician who conducted a physical examination on the child. Specifically, defense counsel asked Tirado:

A-1591-17T1

Q. With regard to the interview that [Amelia] gave to the NJ Cares doctor, at some point in time, is it fair to say that she told the NJ Cares doctor, she alleged that [defendant] also took pictures of her with his cell phone and that he showed her pornographic videos while they were in his car, also?

A. Yes. Yes.

Q. Okay. But from your understanding, she never said that in her interview with Detective Leyman; correct?

A. Correct.

Defense counsel questioned Tirado about defendant's references to the devil and noted that she wrote in her report that defendant "appeared confused and disoriented during [her] interview." Defense counsel also questioned Tirado about Amelia's father, Diego, and his initial concerns about his daughter's credibility. Defense counsel asked Tirado:

Q. Did he, in fact, say that [Amelia] had a history of making things up?

A. He said that -- he -- I asked him if he believed his daughter. "He told the worker he wanted to make sure it happened because [Amelia] has a history of making things up." And he gave an example about, she lied about --

The record shows the trial judge interrupted the witness's testimony and sua sponte requested a sidebar conference with counsel. At this point, the transcript of the sidebar conference states: "Whereupon a significantly inaudible

sidebar discussion commenced . . . [.]" The few audible words included in the transcript are not enough to infer, within a reasonable degree of reliability, the nature of the discussion, the legal issues raised, or the ultimate decision reached by the trial judge. When the sidebar conference ended, defense counsel asked Tirado the following question:

> Q. Aside from the time . . . that's specifically mentioned in your report, did you ever inquire with [Amelia's] parents as to whether or not there were any other times?
>
> A. No.

Defendant did not call any witnesses and opted not to testify in his own defense. Against this record, defendant raises the following arguments in this appeal.

V

POINT I

THE JUDGE IMPROPERLY DENIED DEFENDANT'S MOTION TO EXCLUDE HIS STATEMENT TO A DCP&P INVESTIGATOR THAT WAS THE PRODUCT OF AN UNRECORDED, UNWARNED CUSTODIAL INTERROGATION IN VIOLATION OF HIS FIFTH AND SIXTH AMENDMENT RIGHTS AND OF HIS STATE COMMON-LAW RIGHT AGAINST SELF-INCRIMINATION AND STATE-CONSTITUTIONAL RIGHT TO COUNSEL.

A. Under Both The Fifth Amendment And New Jersey Common Law, For Two

22

Independent Reasons, New Miranda Warnings Were Required In Order For Investigator Tirado To Obtain A Knowing And Voluntary Waiver From Defendant Of His Fifth Amendment And State-Law Rights Against Self-Incrimination.

(1)   The Totality Of The Circumstances Warranted A Finding That Defendant Could Not Knowingly And Voluntarily Waive His Rights Without New Miranda Warnings.

(2)  In Defendant's First Interrogation, He Invoked His Right To Counsel, And, Thus, Under State v. Hartley, New Miranda Warnings Were Required Before A New Interrogation Could Occur.

B.  Under The Sixth Amendment And The State Constitution, Defendant Should Not Have Been Interrogated In The Manner That He Was By Investigator Tirado Once His Sixth Amendment Right To Counsel Had Attached.

 (1)  Even The Diminished Version Of The Sixth Amendment Right To Counsel That Is Recognized In Montejo v. Louisiana, Mandated That Reasonably Contemporaneous Miranda Warnings Must Be Given To A Defendant In Order For That Defendant To Properly Waive The Sixth Amendment Right To Counsel.

(2) Even If The Sixth Amendment Right To Counsel Could Possibly Be Deemed To Be Waived Here Under Montejo, The New

23

Jersey Constitution And Common Law
Would Mandate Suppression.

POINT II

THE TRIAL JUDGE MERGED A CONVICTION, AND THEN ERRONEOUSLY SENTENCED DEFENDANT TO PAY PENALTIES ON THAT CONVICTION ANYWAY; THE JUDGE ALSO ERRONEOUSLY IMPOSED THE MAXIMUM PENALTY UNDER N.J.S.A. 2C:14-10 WITH NO REFERENCE TO DEFENDANT'S ABILITY TO PAY. (Not Raised Below)

After reviewing the record developed before the trial court, we reverse defendant's conviction and remand this matter for a new trial.

We are satisfied the trial judge committed reversible error when he denied defense counsel's motion to bar the admission of inculpatory statements defendant allegedly made to Division investigator Tirado when she interviewed him at the county jail. We hold Tirado was required to apprise defendant of his Miranda rights because she interviewed him in a custodial setting. Under the totality of the circumstances, defendant's waiver of his Miranda rights thirty-six days earlier when he was interrogated at the police station by the two detectives was not sufficient to find, beyond a reasonable doubt, that his waiver remained legally viable. However, we hold that Tirado did not violate defendant's Sixth Amendment right to counsel when she interviewed him without his attorney's consent.

24                                                          A-1591-17T1

Defendant was arrested on these charges on April 7, 2014. Bridgeton Police Detectives Leyman and Martinez administered <u>Miranda</u> warnings to defendant at the police station. Defendant thereafter voluntarily waived his Fifth Amendment rights and agreed to answer the detectives' questions during the following two hours. Defendant did not make any incriminating statements during this interrogation. He was transported to the county jail and held there until his trial and subsequent conviction. On May 16, 2014, thirty-six days after he was first apprised of his <u>Miranda</u> rights, Tirado interviewed defendant at the county jail without his attorney's knowledge or consent and without again informing him of his <u>Miranda</u> rights.

At the N.J.R.E. 104(c) evidentiary hearing conducted by the judge before the start of trial, Tirado testified the Division received a referral from the Bridgeton Police Department involving allegations of sexual abuse of a child by her paternal uncle. The victim was then thirteen years old. Tirado testified her responsibility was to determine whether there was evidence that the child had been abused and whether the parents were aware of the abuse. She first interviewed the victim, her siblings, and the parents.

Tirado testified that she was also required to interview the perpetrator of the abuse. It is undisputed that at the time Tirado interviewed defendant at the Cumberland County Jail: (1) she had spoken with law enforcement agents

assigned to investigate the case; (2) she had viewed the video-audio record of the child's interview by law enforcement detectives; (3) she had read the statement defendant gave to law enforcement agents after he was given Miranda warnings; and (4) she knew defendant had been assigned an attorney to represent him in this case.

In response to the prosecutor's questions, Tirado made clear that she was conducting an independent investigation. She did not ask any questions on behalf of the Prosecutor's Office nor was she ever requested by any law enforcement agent to do so. She also was not contacted by any attorney on behalf of defendant. The purpose of her interview was to determine whether defendant had abused his niece.

> Q. Now, was the purpose of your interview to gain additional evidence that could be used in the prosecution against [defendant], or was it to gain information to determine whether or not a substantiation of abuse or neglect was proper?
>
> A. To see whether a substantiation of abuse or neglect was conducted.
>
> Q. Now, when you sit down with [defendant] in this isolated area that you're speaking about, when you first sit down with him, did you at any time provide what law enforcement typically refers to as Miranda warnings?
>
> A. No.

A-1591-17T1

Q. Okay. And are you familiar with the term <u>Miranda</u> warnings?

A. Yes.

Tirado also testified that defendant never told her that he did not want to answer her questions or asked her to stop the interview.

On cross-examination at the N.J.R.E. 104(c) hearing, Tirado admitted it is "normal" for her to inform the police of anything "criminal" she discovers in the course of her investigation.

Q. So on a regular basis, if . . . somebody admits to something or you -- some allegations, you hand that information over; correct?

A. Yes.

Q. And you knew there were criminal charges already pending against [defendant]; correct, when you interviewed him?

A. Yes.

The trial judge found defendant was in a custodial setting at the time the Division investigator interviewed him at the county jail. The judge also found that under these circumstances, the Division investigator was required to advise defendant of his <u>Miranda</u> rights and obtained his knowing, intelligent waiver of those constitutional rights before asking him any questions related to these charges. We agree.

A-1591-17T1

The facts we confront here are similar to the facts this court addressed in State v. Helewa, 223 N.J. Super. 40 (App. Div. 1988). In Helewa, the defendant was arrested by Old Bridge Township Police Department detectives and charged with sexually assaulting his two teenaged daughters. Id. at 42. He was transported to police headquarters, advised of his Miranda rights "and given a Miranda warning card . . . [.]" Ibid. The defendant read the warning card, signed it in the presence of a police officer, and did not request an attorney. Ibid. However, unlike what occurred here, the defendant in Helewa was not questioned by law enforcement agents until he was transferred to the Middlesex County Adult Corrections Center (Corrections Center) five hours later. Ibid.

A Division[6] caseworker interviewed the defendant's wife and daughters on the evening of the defendant's arrest. Ibid. Although she asked to interview the defendant that night as well, Old Bridge Police Officers requested that she postpone his interview. Ibid. The caseworker also obtained a copy of the complaint the police filed against the defendant and the Miranda card he signed. Id. at 42-43. We thus noted that the caseworker "was aware that [the] defendant had been advised of his rights" when she arrived to interview him the following day at the Corrections Center. Id. at 43.

---

[6] At the time this court decided Helewa in 1985, the Division was named "Division of Youth and Family Services (DYFS)."

The interview between [the] defendant and [the Division caseworker] took place in a small office or "Special Needs Pod" within the Corrections Center, but outside of the presence of the police or the prison guards. [The caseworker] introduced herself as a [Division] caseworker and explained that she needed to discuss the allegations of sexual abuse with him. [The] [d]efendant, however, expressed reservations about discussing these allegations and told [the caseworker] that "he had talked with his two lawyers and he had talked to his father and he had talked to his girlfriend . . . and he wasn't sure if his lawyer would get mad at him for speaking to [her]." In response, [the caseworker] told him that "he should do what he thought was best" and explained that although she did not work for the prosecutor's office or the police department, a copy of his statement would be sent to the prosecutor's office.

[The caseworker] did not pressure [the] defendant into talking or indicate that the interview would be for his benefit. However, she did tell him, "You can talk to me, this is part of the investigation", to which [the] defendant apparently responded, "I don't know whether my lawyer will be mad at me or not but I have nothing to lose so I'm going to talk to you." Although [the] defendant was aware at this time that he did not have to talk to her and that he had the right to have an attorney present, he was not re-advised of his <u>Miranda</u> rights by [the caseworker] prior to giving the interview. The interview lasted an hour and 15 minutes. Eventually, [the caseworker] turned [the] defendant's statement over to the Middlesex County Prosecutor's Office.

[<u>Ibid.</u>]

Writing for the court in <u>Helewa</u>, Judge Michels noted that in <u>Mathis v. United States</u>, 391 U.S. 1 (1968), the United States Supreme Court suppressed

an oral statement the defendant made to an Internal Revenue Agent (IRS) while he was serving a state prison sentence. Helewa, 223 N.J. Super. at 45. That case involved an IRS agent who elicited information from the defendant in connection with a routine civil action to collect delinquent taxes, without first advising him of his Miranda rights. Ibid. However, "the Government began a full-fledged criminal investigation eight days later and successfully prosecuted [the] defendant for two counts of tax fraud." Ibid. The Government argued the defendant's oral statements were admissible because they were solicited in connection with a civil enforcement action. Ibid. The Supreme Court rejected this argument and held:

> It is true that a "routine tax investigation" may be initiated for the purpose of a civil action rather than criminal prosecution . . . But tax investigations frequently lead to criminal prosecutions, just as the one here did . . . And, as the investigating revenue agent was compelled to admit, there was always the possibility during his investigation that his work would end up in a criminal prosecution.
>
> [Ibid. (quoting Mathis, 391 U.S. at 4).]

Judge Michels also cited Estelle v. Smith, 451 U.S. 454 (1981), a situation analogous to Mathis, where the Court held "that a court-ordered psychiatric examination, given without Miranda warnings, cannot be used in the penalty proceeding of a capital murder case to demonstrate the defendant's depravity."

A-1591-17T1

Id. at 45-46 (citing Estelle, 451 U.S. at 467). Finally, Judge Michaels cited United States v. Mata-Abundiz, 717 F.2d 1277 (9th Cir.1983), where the Circuit Court relied on Mathis to suppress the statement the defendant gave to a criminal investigator from the Immigration and Naturalization Service while the defendant was incarcerated on state firearm charges. Id. at 46. Thus, following the constitutional principles established in this trilogy of cases, we held in Helewa "that Miranda applies to a custodial interview conducted by a [Division] caseworker . . . under the circumstances here present." Id. at 47.

We have consistently recognized and endorsed this constitutional principle. In State v. Flower, 224 N.J. Super. 208 (Law Div. 1987), aff'd o.b., 224 N.J. Super. 90 (App. Div. 1988), we upheld the suppression of a statement obtained from the defendant by a Division caseworker in an interview conducted in a county jail. There, the caseworker did not first advise the defendant of his rights under Miranda, despite knowing the defendant was incarcerated on the charge of sexually assaulting a three-and-a-half year old child. Id. at 211.

However, relying on our Supreme Court's decisions in State v. Nyhammer, 197 N.J. 383 (2009), State v. Melvin, 65 N.J. 1 (1974), and State v. Magee, 52 N.J. 352 (1968), the trial judge here found the Miranda warnings Detectives Leyman and Martinez gave defendant on April 7, 2014 remained constitutionally viable under these circumstances to admit defendant's

31

inculpatory statements during Tirado's interview at the county jail. According to the trial judge, defendant "never lost focus of the fact that the things that he . . . was saying, were useable against him" and "knew he had a right to an attorney and he didn't have to speak if he didn't want to." The trial judge acknowledged that the facts here involve "a substantially longer period of time . . . than was present in the <u>McGee</u> case, or the <u>Melvin</u> case, or the <u>Niemeyer</u> case." Nonetheless, he concluded:

> I do find that it is significant that he remained incarcerated from the time that his initial interview to the time of the second interview. But, I find that it is significant because it demonstrates that the defendant never had an opportunity to lose focus on why he was there. He was incarcerated immediately after being interviewed, initially, where he made his general denials.
>
>  . . . .
>
> [P]rior to his statement he was . . . aware that the person he was speaking to was an agent of the State of New Jersey. He understood he was dealing with a person who was there under color of authority of the State, when he was making his statements.
>
> [I]t was not a situation as if [an] undercover person was being placed into this environment in order to get him to speak without an understanding that what he was saying was an official statement on his part.
>
> She identified herself as a DCP&P worker. She indicated she was investigating the circumstances of the

> same event for which he had previously been <u>Mirandized</u>.
>
>     . . . .
>
> [T]he Court finds . . . his <u>Miranda</u> rights were intact at the time of the DCP&P worker's interview, that the passage of time did not, in and of itself, work to vitiate the validity of the waiver he gave at the time of his initial interview.

The trial judge's reliance on the Court's holding in <u>Magee</u> was misplaced. In <u>Magee</u>, the police apprised the defendant of his rights under <u>Miranda</u>. Two-and-a-half-days later, the defendant, while in custody, voluntarily came forward and made inculpatory statements. 52 N.J. at 372-75. Under these circumstances, the defendant in <u>Magee</u> argued that when he made "an unsolicited invitation" to the police to question him further, the officers were required to repeat the <u>Miranda</u> warnings before proceeding further. <u>Id.</u> at 374.

Writing for the Court, Justice Francis rejected the defendant's argument but included the following significant caveat which we highlight here:

> Once <u>Miranda</u>'s rule has been complied with at the threshold of the questioning it is not necessary as a matter of law to repeat the warnings at each successive interview. . . . In this connection the important factors are whether the suspect understood that he did not have to speak, the consequences of speaking, and that he had the right to counsel before doing so if he wished. <u>A circumstance to be considered also is the period of time between the warnings and the volunteered inculpatory admission. Here the time lapse was short, and, as we</u>

> have said, defendant was not a neophyte in court matters and the use of counsel.
>
> [Id. at 374-75 (emphasis added).]

Here, the trial judge concluded that the Miranda warning defendant received from Bridgeton Detectives Leyman and Martinez at the time of his arrest on April 7, 2014 were sufficient to overcome Tirado's failure to carry out her obligation to apprise him of his Miranda rights when she interviewed him at the county jail thirty-six days later on May 16, 2014. We disagree. These facts are critically different from the circumstances the Court confronted in Magee. Here, defendant made the inculpatory statements in response to Tirado's questions. He did not voluntarily offer or spontaneously utter these inculpatory remarks to Tirado. Furthermore, the record shows this is defendant's first and only involvement with the criminal justice system. Finally and most significantly, the time gap here was thirty-six days.

As an appellate court, we are bound to defer "to a trial court's factual findings concerning the voluntariness of a confession that are based on sufficient credible evidence in the record." State v. L.H., 239 N.J. 22, 47 (2019) (citing State v. Elders, 192 N.J. 224, 244 (2007)). However, "'[w]hen faced with a trial court's admission of police-obtained statements, an appellate court should engage in a searching and critical review of the record to ensure protection of a

defendant's constitutional rights.'" Ibid. (quoting State v. Hreha, 217 N.J. 368, 381-82 (2014) (citation omitted)).

Under the totality of these circumstances, we conclude the record does not support the trial judge's finding that defendant's Miranda rights remained legally viable at the time Tirado interviewed him thirty-six days later. Under these circumstances, it is unreasonable to expect an ordinary person in defendant's situation to recall and meaningfully comprehend Miranda rights read to him by police investigators more than a month earlier. In short, the circumstances here materially diluted the effectiveness of the warning the police investigators provided defendant on April 7, 2014. State v. Dispoto, 189 N.J. 108, 124-25 (2007).

Tirado also failed to follow the standards codified in Rule 3:17(a), which requires that "custodial interrogations conducted in a place of detention must be electronically recorded when the person being interrogated is charged with . . . aggravated sexual assault, sexual assault, aggravated criminal sexual contact, [and/or] criminal sexual contact . . . [.]" Rule 3:17(b) lists the circumstances under which electronically recording is not required. None of the exemptions listed in Rule 3:17(b) apply here.

Defendant also argues Tirado violated his Sixth Amendment right to counsel by interviewing him at the county jail without first obtaining the consent

of his attorney. We disagree. At the time Tirado interviewed defendant, she was not required to obtain his attorney's consent to interview him at the county jail.

Our Supreme Court has made clear that after an indictment, the State "should not initiate a conversation with defendants without the consent of defense counsel." State v. Sanchez, 129 N.J. 261, 277 (1992). After a defendant is indicted, he or she may not waive his right to counsel without the advice of counsel. Ibid. However, the Court has consistently declined repeated efforts to extend Sanchez's holding to earlier criminal proceedings. State ex rel. P.M.P., 200 N.J. 166, 175 (2009); State v. A.G.D., 178 N.J. 56, 58 (2003); State v. Tucker, 137 N.J. 259, 291 (1994).

In Sanchez, the Court explained the rationale for forbidding "prosecutors or their representatives" from initiating a conversation with defendants without the consent of defense counsel:

> The return of an indictment transforms the relationship between the State and the defendant. By obtaining the indictment, the State represents that it has sufficient evidence to establish a prima facie case. Once the indictment is returned, the State is committed to prosecute the defendant. From that moment, if not before, the prosecutor and the defendant are adversaries. Questioning the accused can be only "for the purpose of buttressing . . . a prima facie case." The spotlight is on the accused. Under those circumstances, the perfunctory recitation of the right to counsel and to

A-1591-17T1

remain silent may not provide that defendant with sufficient information to make a knowing and intelligent waiver. Such a recitation does not tell the defendant the nature of the charges, the dangers of self-representation, or the steps counsel might take to protect the defendant's interests. Those steps include pretrial motions such as those to test the sufficiency of the indictment or to suppress illegally-seized evidence. They also include the negotiation, subject to the approval of the court, of a plea agreement. Given the adversarial nature of their relationship, for the State's representatives to communicate adequately that information to an indicted defendant would be difficult, nigh to impossible.

[129 N.J. at 276-77 (citations omitted).]

Here, Tirado's role as a Division investigator was to determine whether Amelia was safe; whether her parents had taken the necessary measures to ensure her physical safety and emotional welfare; and to investigate the veracity of Amelia's allegations of sexual abuse against her paternal uncle. Tirado's testimony at trial describing her activities and responsibilities in this case is consistent with the duties of Division investigators codified in the regulations promulgated by the Department of Children and Families, N.J.S.A. 9:3A-1 to -3A-17.

Pursuant to N.J.A.C. 3A:10-3.1(a), a child protective investigator is required to interview a child who may have been abused in person and individually. During the investigation of a report containing any allegation, the

child protective investigator shall observe each non-verbal alleged child victim. The child protective investigator shall use sensitivity to avoid further trauma to each alleged child victim. The investigator is also required to interview "the reporter and each other person identified in the current report or related information as having knowledge of the incident . . . including, but not limited to the alleged perpetrator." N.J.A.C. 3A:10-3.1(b) (6) and (7).

The Court's holding in <u>Sanchez</u> is predicated on the notion that the relationship between a defendant and the prosecutor becomes adversarial only after the return of a grand jury indictment. We discern no legal basis to apply a different standard to review Tirado's interactions with defendant in this case. Moreover, unlike the activities of a prosecutor's investigator, the scope of a Division investigator's role at this stage of the case is codified in N.J.A.C. 3A:10-3.2. We thus hold that the Court's holding in <u>Sanchez</u> applies with equal force to Tirado in her role as a Division investigator. Her decision to interview defendant without first obtaining his attorney's consent did not violate defendant's Sixth Amendment right to counsel.

VI

We disagree with the State that the admission of Tirado's testimony was harmless error. The State did not present any physical or forensic evidence to corroborate Amelia's testimony. The State's case against defendant was entirely

based on the credibility of the complaining witness and the admissions of defendant's inculpatory statements made to his brother and to the Division's investigator.

"The test for determining whether an error is harmless 'is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'" Sanchez, 129 N.J. at 278 (quoting Chapman v. California, 386 U.S. 18, 23-24 (1967)). The key question here is not whether the State presented "sufficient evidence" for a reasonable jury to convict defendant absent the unlawfully obtained statements. The standard here is whether we are "'able to declare a belief that [the error] was harmless beyond a reasonable doubt.'" State v. McCloskey, 90 N.J. 18, 32 (1982) (quoting Chapman, 386 U.S. at 24). Under the totality of these circumstances, we cannot so declare. Based on this decision, we are not required to, and expressly do not reach defendant's remaining argument attacking the validity of the sentence imposed by the trial court.

VII

Defendant's conviction is reversed and the matter is remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

39